IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DELORES OVARD,<br><br>Plaintiff,<br><br>vs.<br><br>SUMMIT COUNTY,<br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:11-cv-592 |

Plaintiff Delores Ovard is a Field Supervisor in the Summit County Animal Control Division. Ms. Ovard alleges that Defendant Summit County discriminated against her due to her age in violation of the Age Discrimination in Employment Act (ADEA). Summit County moves the court to enter summary judgment in its favor on all of Ms. Ovard's claims. (Dkt. 74.) For the reasons stated below, the court GRANTS Summit County's motion.

BACKGROUND[1]

Ms. Ovard was hired by Summit County's Animal Control Division in 1993 when she was 51 years old. Since she was hired, Ms. Ovard has been promoted to the rank of Officer I, Officer II, Officer III, and ultimately to the position of Field Supervisor. Summit County promoted Ms. Ovard to the Field Supervisor position in 2004, when Ms. Ovard was 62 years old.

---

[1]Summit County has raised a number of evidentiary objections to the materials submitted by Ms. Ovard in support of her claims. (*See* Dkt. 106.) But even if all of Ms. Ovard's evidence is deemed admissible, the court finds that Ms. Ovard has not presented sufficient evidence to proceed to a jury on her claims. The court therefore does not need to address the Defendant's evidentiary objections.

Ms. Ovard continues to be the Field Supervisor for the Animal Control Division.

The events at issue in this lawsuit occurred between 2005 and 2011. During that time, Director Bob Bates was the head of the Animal Control Division and had authority over Field Supervisor Ovard and the other officers and shelter attendants who worked in the Division. Director Bates, in turn, reported to the Sheriff's Office, who took over management of the Animal Control Division in December 2004. The Sheriff's Office controlled the Division until January 2011, when Summit County transferred supervision of the Division to the Administrative Services Department. Brian Bellamy, who is the head of the Administrative Services Department, currently oversees the Animal Control Division. Because Director Bates was laid off in February 2012 as a result of budget cuts, Ms. Ovard now reports directly to Director Bellamy.

The majority of Ms. Ovard's allegations of discrimination occurred during the time that the Sheriff's Office was responsible for managing the Division and involve Ms. Ovard's interactions with either Director Bates or Captain David Booth. Captain Booth was employed in the Sheriff's Office and had supervisory authority over the Animal Control Division at various times between 2005 and 2011. According to Summit County, Captain Booth supervised the Division briefly in January 2005 when the Sheriff's Office first began managing the Division. He again oversaw the Division from October 2006 until November 2007, when he was replaced by Captain Alan Siddoway. In March 2008, Captain Dean Carr[2] replaced Captain Siddoway and held the supervisory position until April 2010, when Captain Booth once again assumed control.

_____

[2]Captain Carr was promoted to the position of Undersheriff in October 2009. The court refers to either Captain Carr or Undersheriff Carr depending on the relevant time.

According to Ms. Ovard, Captain Booth influenced decisions in the Division continuously from January 2005 to January 2011, even during the periods when he was not nominally in charge. For the purposes of this motion, the court assumes that Ms. Ovard is correct and that Director Bates consulted with Captain Booth throughout the relevant time period.

The core of Ms. Ovard's allegations against Summit County is her assertion that Captain Booth and Director Bates favored a younger employee, Shellie Keetch, over Ms. Ovard. Ms. Keetch was 47 years old and Ms. Ovard was 69 years old at the time when Ms. Ovard filed her Complaint. Ms. Keetch was an Officer III, which was underneath the rank of the Field Supervisor. But beginning in 2006, Officer Keetch was given additional supervisory responsibilities over the animal shelter. Moreover, Ms. Ovard was assigned an undesirable working schedule, including the weekend shift and the late shift.

Ms. Ovard's alleged instances of discrimination can be reduced to six broad categories: (1) changes to Ms. Ovard's assignments and duties; (2) changes to Ms. Ovard's work schedule; (3) a disciplinary meeting with Director Bates and Captain Booth on May 18, 2010; (4) a disciplinary meeting with Director Bates and Captain Booth on September 28, 2010; (5) a performance evaluation meeting with Director Bates on March 23, 2011; and (6) comments made about when Ms. Ovard would retire. The court summarizes below the facts that support each of these alleged instances of discrimination.

<u>Assignments and Duties</u>

Around April 2006, Captain Booth decided to reassign some responsibilities in the Animal Control Division because he wanted a number of duties to be performed by just one person. (Booth Decl. ¶ 7.) On April 12, 2006, Captain Booth gave Officer Keetch a

memorandum detailing assignments that would now be her "personal responsibility." (Booth Memorandum, Apr. 12, 2006, Ex. 13 to Dkt. 79.) These assignments generally related to the management and supervision of the animal shelter. The responsibilities included revising and updating ordinances, training, vaccination clinics, pet abuse education, and overseeing all intern and volunteer activity. (*Id.*) Ms. Keetch was also given authority over a number of the Division's animal shelter programs, such as the Pet of the Week program, Spay and Neuter clinics, and Adopt-a-thons. (*Id.*) Ms. Ovard alleges that Captain Booth told Officer Keetch to supervise the shelter attendants and any officers who were assigned to work in the shelter. Ms. Ovard claims that all of these functions had been her responsibility before Captain Booth effectively promoted Officer Keetch. But it is undisputed that Ms. Ovard retained her title of Field Supervisor, was not officially demoted, and did not receive a pay cut. Ms. Ovard continued to supervise officers in the field.

In February 2007, some employees complained to Captain Booth that Officer Keetch was overstepping her bounds. On March 12, 2007, Captain Booth gave Officer Keetch another memorandum that reiterated the assignments she had been given. (Booth Memorandum, Mar. 12, 2007, Ex. 15 to Dkt. 79.) Ms. Ovard disputes that Captain Booth gave Officer Keetch this second memorandum.

In January 2010, Director Bates and Undersheriff Carr decided to change Officer Keetch's title to Administrative Assistant. Her assigned duties included the responsibilities that she had performed since 2006. Ms. Ovard asserts that this change occurred only after Ms. Ovard complained to Undersheriff Carr that her supervisory duties had been taken away from her. Ms. Ovard believes that the memorialization of Ms. Keetch's duties as Administrative Assistant did

not include all of the job duties that Ms. Keetch had been performing. According to Ms. Ovard, Ms. Keetch continued to perform many of Ms. Ovard's supervisory duties until January 2011, when management of the Animal Control Division shifted from the Sheriff's Office to the Administrative Services Department. (Ovard Decl. ¶ 54, Dkt. 92.)

The parties dispute the motivations of Captain Booth and Director Bates for this shift in responsibilities. According to Officer Stacy Gunn, who occupied the same Officer III position as Ms. Keetch in the departmental hierarchy, Director Bates favored Ms. Keetch over all of the Animal Control employees, including herself and Ms. Ovard. (Gunn Dep. 73:18-74:16.)

Summit County asserts that the shifting of assignments to Ms. Keetch occurred in 2006 and 2007, with no changes happening after that time. Ms. Ovard disputes this statement and argues that "[a]fter Officer Keetch was first assigned part of the Plaintiff's job duties in April 2006, as time went by she was authorized to perform additional supervisory duties." (Pl.'s Opp. Mem., at xl.) But Ms. Ovard has not identified with any particularity what additional supervisory duties were later transferred to Ms. Keetch, or when such a transfer occurred.

Work Schedule

Ms. Ovard alleges that before April 22, 2006, she worked during the day from Monday through Friday. (Ovard Decl. ¶ 19.) On April 22, 2006, she was taken off her previous schedule and placed into a rotation with the other officers in which she was periodically scheduled to work late shifts and on weekends. (Work Schedules, Ex. 6 to Dkt. 94.) At the same time, Ms. Keetch was taken out of the rotation schedule and scheduled to work during the day from Monday through Friday. (*Id.*) Beginning in March 2007, Ms. Ovard was put on a set schedule to work Friday through Tuesday every week, excluding holidays and vacations. (*Id.* at PLT 332.) The

new schedule did not result in a change to Ms. Ovard's title or a pay cut, but Ms. Ovard asserts that the change caused her to lose responsibility because she could no longer supervise her officers who did not work on the weekend.

According to Summit County, Ms. Ovard's schedule was adopted to respond to Sheriff David Edmunds's desire to have a supervisor working on every weekend. (Edmunds Dep. 8:4-13, Ex. 51 to Dkt. 79.) Ms. Ovard and Director Bates were the only supervisors in the Animal Control Division.

Ms. Ovard continued to work the weekend schedule even when Captain Siddoway and Captain Carr were in charge of the Animal Control Division. (Ovard Dep. 83:15-84:8.) In March 2010, Ms. Ovard was put back on a Monday through Friday schedule. This change occurred after Ms. Ovard had a discussion with Undersheriff Carr in which Undersheriff Carr allegedly agreed that Ms. Ovard could not perform her supervisory job duties if she was scheduled to work on the weekends. (Ovard Decl. ¶ 35.) Ms. Ovard worked the Monday through Friday schedule until June 12, 2010, when she was put back on the weekend and afternoon shifts. (*See* Work Schedules, at PLT 376-78, Ex. 6 to Dkt. 94.) This change occurred just a few months after Captain Booth once again took charge of official supervision over the Animal Control Division in April 2010.

According to Summit County, the change back to a weekend schedule resulted from fluctuating levels of staffing that occurred because Officer Adrienne Steed was on loan at various times to the Sheriff's Office. (*See* Bates Handwritten Notes from Meeting with Captain Booth, June 9, 2010, Ex. 23 to Dkt. 79 (noting that "Adrianne" was returning and memorializing that the Field Supervisor would work the afternoon shift and weekends for the summer schedule).) Ms.

Ovard disputes this assertion. She agrees that she was assigned the weekend shift when Officer Steed returned to the Animal Control Division on June 12, 2010. (Work Schedules, at PLT 376.) But Ms. Ovard points out that she remained on the weekend schedule even after Officer Steed went back to the Sheriff's Office on July 24, 2010. (*Id.* at PLT 379-82.)

Ms. Ovard returned to working a Monday through Friday schedule in January 2011 after the Sheriff's Office was no longer managing the Animal Control Division.

Disciplinary Meeting on May 18, 2010

In May 2010, Director Bates performed Officer Keetch's evaluation as he had in previous years. (Bates Dep. 114:18-118:15.) An operational chart issued in January 2010 listed Officer Keetch as reporting directly to Director Bates. (Organizational Chart January 2010, Ex. 9 to Dkt. 94.) But according to Ms. Ovard, this chart was changed to reflect that Officer Keetch reported to Field Supervisor Ovard after Ms. Ovard complained to Undersheriff Carr about the transfer of her responsibilities. (Organizational Chart March 2010, Ex. 43 to Dkt. 117.) Based on this document, the Human Resources Assistant told Ms. Ovard to perform Officer Keetch's evaluation. Ms. Ovard performed the evaluation even after Director Bates told her not to do so. (Bates Dep. 114:18-118:15.) Director Bates later changed Ms. Ovard's evaluation and gave Officer Keetch a higher score. (Ovard Decl. ¶ 61; Bates Dep. 116:17-25.) According to Summit County, the organizational chart was then changed back to the original chart from January 2010, with Officer Keetch reporting directly to Director Bates. (Corrected Organizational Chart, Ex. 30 to Dkt. 79.)

Because Ms. Ovard failed to follow Director Bates's order, Director Bates and Captain Booth met with Ms. Ovard on May 18, 2010. During that meeting, they discussed the

importance of following the chain of command. The meeting was memorialized in a "Letter of Counsel," which Ms. Ovard asserts is evidence of a reprimand. (Ovard Decl. ¶ 62.)

On July 30, 2010, Ms. Ovard lodged an internal grievance with Summit County in which she brought up a number of issues, including her weekend work schedule, the alleged change in Ms. Ovard's supervisory responsibilities, and the issue concerning Ms. Keetch's evaluation and the Letter of Counsel that was given to Ms. Ovard. (Grievance, Ex. 20 to Dkt. 95.) The Personnel Advisory Committee considered the grievance and made the following conclusions: (1) Ms. Ovard's grievance concerning her work schedule was denied because Summit County policy allows management to assign schedules and weekend coverage was rationally related to the needs of the Animal Control Division given that there were only two supervisors; (2) Ms. Ovard's grievance about Ms. Keetch's new job title of Administrative Assistant was upheld because the new job included significant changes in responsibility and the job title and job description had not been submitted to the Human Resources Department for approval; (3) Ms. Ovard's grievance about the circumstances of Ms. Keetch's evaluation was upheld in part and denied in part, finding that Ms. Ovard appropriately followed the Human Resources directive when she performed the evaluation, but that Director Bates had not attempted to falsify records or deceive anyone when he changed the evaluation; (4) Ms. Ovard's grievance that her weekend schedule and the Letter of Counsel were retaliatory was upheld in part and denied in part, affirming the propriety of assigning Ms. Ovard weekend shifts but ordering Director Bates to remove the Letter of Counsel or any references to a reprimand from Ms. Ovard's file. (PAC Findings & Conclusions, Ex. 33 to Dkt. 79.)

<u>Disciplinary Meeting on September 28, 2010</u>

On September 9, 2010, the Sheriff's Office held a Kronos[3] training for employees in the Animal Control Division. There was a morning session and an afternoon session. The parties dispute whether the training session was mandatory and, if it was, whether the Sheriff's Office adequately informed Ms. Ovard that the session was mandatory. In any event, Ms. Ovard missed the training because it was her day off and she was taking her husband to a doctor's appointment. She testified that she was going to try to make the afternoon session if she could, but she did not show up. (Ovard Decl. ¶ 66.) Captain Booth noticed that Ms. Ovard wasn't at the training and observed that some of the officers who reported to her missed the training as well. Around the same time, Captain Booth heard from Undersheriff Carr that Ms. Ovard had failed to complete the performance evaluation of one of her officers, Terri Peterson, in accordance with new directives from the Sheriff's Office. (Booth Decl. ¶ 24.) Specifically, the Sheriff's Office believed that performance evaluations were overinflated and wanted evaluators to give their officers a score of "3" instead of "4" for an adequate job performance.[4] (*Id.*) Captain Booth decided to discuss these issues with Director Bates and Ms. Ovard at a meeting to be held on September 28, 2010.

Meanwhile, Ms. Ovard filed a discrimination action with the EEOC and the Utah Antidiscrimination and Labor Division (UALD) on September 7, 2010. Captain Booth testified that he was unaware of this pending action when he scheduled the meeting, but that before the meeting occurred he became aware that Ms. Ovard had filed a complaint. (*Id.* ¶ 26.) Captain

---

[3]Kronos is a type of software used for payroll and other human resources functions.

[4]The evaluation scale runs from "1" to "5".

Booth asked Director Bellamy what he should do and Director Bellamy recommended that Captain Booth proceed as he would with any other employee. (*Id.*) Captain Booth decided to record the meeting so there would be no doubt as to what happened. (Booth Dep. 143:7-12.)

Ms. Ovard claims that the first ten minutes of the meeting were not recorded and that Captain Booth reprimanded her in a hostile manner during this time. (Ovard Dep. 260:21-261:7.) During the recorded portion of the meeting, Captain Booth told Ms. Ovard to explain to her officers that missing a mandatory meeting was "inexcusable. It's insubordination and we don't appreciate that behavior." (Meeting Transcript, Sept. 28, 2010, at 5-7, Ex. 40 to Dkt. 79.) Ms. Ovard points out that insubordination can be grounds for termination. (Summit County Personnel Policies, at SC 1052, Ex. 12 to Dkt. 95.) Captain Booth memorialized the meeting with a note that he put in Ms. Ovard's personnel file. Ms. Ovard asserts that the note was disciplinary. But Summit County cites the testimony of Director Bellamy, who stated that he didn't view the note as disciplinary. (Bellamy Dep. 42:14-44:3.)

Captain Booth also discussed Ms. Ovard's evaluation of Officer Peterson and noted that the score was somewhat high. According to Summit County, Captain Booth's explanation of why the scores were overinflated was sufficient to let Ms. Ovard know that a new directive from the Sheriff's Office asked evaluators to reduce scores to cut back on overinflation. Ms. Ovard equivocates as to what she understood about the new system, but admits that she was told that someone should not be given a "4" just for doing his job. (Ovard Dep. 278:10-279:9.)

Performance Evaluation Meeting on March 23, 2011

Director Bates had a meeting with Ms. Ovard on March, 23, 2011, during which he presented her with her performance evaluation for 2010. He gave her a score of 2.87, which was

much lower than scores in previous years (3.62 in 2006, 3.71 in 2007, 3.57 in 2008, 3.76 in 2009). (Performance Evaluations, Exs. 5-8 to Dkt. 79, Ex. 30 to Dkt. 96.) During the meeting, which Ms. Ovard recorded, Director Bates explained that there was a new system in place. Referring to the Sheriff's Office, Director Bates stated: "But they want us to go to—my understanding is they want us to go to a three as doing your job. That's in the middle. That's the reason most of these have gone to threes and—and that instead of fours." (Meeting Transcript, Mar. 23, 2011, at 4, Ex. 44 to Dkt. 79.)

While explaining why he gave her a "2" for Goal Accomplishment, Director Bates told Ms. Ovard that she had failed to hand in a report. Ms. Ovard explained that she had done the report and Director Bates realized that it was sitting on his desk. The parties dispute whether Director Bates changed Ms. Ovard's score as a result of this realization.[5]

According to Ms. Ovard, Ms. Keetch told her that right after the evaluation meeting, Director Bates asked Ms. Keetch to pull up anything she could find to show that Ms. Ovard had not done her job. (Ovard Decl. ¶ 71.) Besides Ms. Ovard's statement, no other evidence backs up this assertion. The court does not find this evidence dispositive, but in any event the court notes that Ms. Ovard's report of Ms. Keetch's statement is inadmissible hearsay.

Comments about Retirement

Ms. Ovard asserts that a number of comments were made about her retirement. The court summarizes these statements below.

---

[5] Even if Director had changed the score, the court notes that Ms. Ovard's overall score would not have changed significantly. There are almost twenty-five categories in the evaluation and the scores for each category are averaged together, with certain categories receiving more weight than others. Goal Accomplishment was not a heavily weighted category. (*See* 2010 Performance Evaluation, Ex. 30 to Dkt. 96.)

Summarizing a meeting with Officer Keetch in notes dated February 13, 2007, Captain Booth wrote, "Shellie Keetch 43 yoc" and later noted that Ms. Keetch "[w]ould like to be field supervisor." (Booth Notes February 2007, at SC 1217, Ex. 4 to Dkt. 94.) The next day, in a meeting with Ms. Ovard, Ms. Ovard alleges that Captain Booth asked her if she wanted to be a field officer instead of the field supervisor. (Ovard Decl. ¶ 29.) Ms Ovard responded that she wanted to remain a field supervisor until she retired. (*Id.*) Captain Booth's notes from the meeting state that Ms. Ovard wanted to remain "at least one year with county until retire." (Booth Notes, at SC 1218.)

Ms. Ovard maintains that after Officer Terri Peterson was transferred to the Animal Control Division, Officer Peterson repeatedly asked Ms. Ovard when she was going to retire. Ms. Ovard asked her why she wanted to know and Officer Peterson replied that Captain Booth had said that Ms. Ovard was going to retire in 2007. (Ovard Decl. ¶ 28.)

Officer Stacey Gunn testified that, in 2009, during a conversation with Director Bates and Officer Keetch, Director Bates asked Officer Gunn if she knew when Ms. Ovard was going to retire and how old she was. (Gunn Dep. 22:17-23:3.) According to Officer Gunn, Officer Keetch stated that the Division would not need a field supervisor after Ms. Ovard retired. (*Id.*)

During a meeting in January 2010, Ms. Ovard told Director Bellamy that she thought Captain Booth was trying to force her to retire. (Ovard Dep. 219:22-220:13.) Officer Gunn was present at that meeting and agrees that Ms. Ovard made this statement. (Gunn Dep. 13:21-24.) It was at this meeting that Director Bellamy suggested that Ms. Ovard should speak with Undersheriff Carr about her concerns. (*Id.*)

During a meeting with Sheriff Edmunds on May 25, 2010, Sheriff Edmunds asked Ms.

Ovard how long she wanted to continue working.  (Ovard Decl. ¶ 43.)  According to Summit County, the Sheriff was simply reading a set of standard questions that he asked all employees that included the question:  "What can we do to keep you with us?"  (Written Questions, Ex. 34 to Dkt. 79.)  Both parties agree that Ms. Ovard said she wanted to see the department working before she left.

Finally, Ms. Ovard claims that in 2010, Captain Booth became angry and said, "I don't know how old you are but when are you going to retire?"  (Ovard Decl. ¶ 46.)  Captain Booth disagrees that he asked this question but recalls a phone call in May 2010 in which Ms. Ovard stated, "I think I want to retire."  (Booth Dep. 125:14-126:5; Booth Decl. ¶¶ 21-22.)  Ms. Ovard reiterated her statement during a meeting the next day, and Captain Booth responded by asking her if she was eligible for retirement and counseling her that, in his experience, employees considering retirement either needed to retire or to stay and engage.  (*Id.*)  Director Bates, who was present at the meeting, corroborates Captain Booth's version of events and states that it was Ms. Ovard who raised the issue of retirement.  (Bates Decl. ¶¶ 8-9.)

ANALYSIS

I.      **Standard of Review**

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."  *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

Ms. Ovard brings three separate claims against Summit County: (1) discrimination based

on disparate treatment; (2) discrimination based on a hostile work environment;[6] and (3)

retaliation. The court addresses each of these claims in turn.

## II.     Disparate Treatment Claim

Ms. Ovard alleges that Summit County treated her differently than other similarly situated

employees due to her age. Before discussing the merits of Ms. Ovard's claim, the court

considers whether Ms. Ovard has timely pursued these claims against the County.

### A.     Time-Barred Acts

Several aspects of Ms. Ovard's discrimination claim based on disparate treatment are

time-barred. Before filing a complaint under the ADEA, a plaintiff must file a charge of

discrimination with the EEOC or the UALD. 29 U.S.C. § 626(d); *Shikles v. Spring/United*

*Mgm't Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005) (exhaustion of administrative remedies is a

jurisdictional prerequisite to the ADEA). Where a claimant has filed charges with the EEOC and

the UALD, the charges must be filed within 300 days of the alleged discriminatory act. 29

U.S.C. §§ 626(d)(2) & 633(b). Because Ms. Ovard filed her first charge of age discrimination on

September 7, 2010, any acts of discrimination that occurred before November 11, 2009, are

untimely.

Ms. Ovard's assertion that many of her responsibilities were transferred to Officer Keetch

is based largely on Captain Booth's memorandum of April 12, 2006, in which he detailed Officer

Keetch's new responsibilities. Ms. Ovard argues that additional responsibilities were transferred

_____

[6]The parties dispute whether Ms. Ovard adequately pled a hostile work environment
claim in her Second Amended Complaint. Ms. Ovard has moved to amend her complaint so that
she can fully state this claim. (Dkt. 109.) As discussed below, the court finds that such an
amendment would be futile because Ms. Ovard has not brought forward sufficient evidence to
survive summary judgment on a hostile work environment claim.

to Officer Keetch after that date, but she has provided no specific instances of what these responsibilities were or whether they were transferred after November 11, 2009. As a result, Ms. Ovard's allegations of discrimination based on the transfer of her duties to Officer Keetch is time-barred.

Similarly, Ms. Ovard cannot challenge the weekend schedule that she was assigned in March 2007. While she continued to work this schedule past November 11, 2009, the act of revising her schedule took place in 2007. "Generally, a cause of action accrues 'on the date the employee is notified of an adverse employment decision by the employer.'" *Holmes v. Utah*, 483 F.3d 1057, 1063 (10th Cir. 2007) (citations omitted). Ms. Ovard therefore was required to challenge her shift to a permanent weekend schedule within 300 days of when that schedule revision occurred. Ms. Ovard may, however, continue to challenge the decision to put her back on weekend and afternoon shifts as of June 12, 2010, a situation that continued until the Administrative Services Department took over management of the Animal Control Division in January 2011.

Finally, Ms. Ovard cannot challenge any performance evaluations or pay increases that occurred before November 11, 2009. In her Second Amended Complaint, Ms. Ovard alleged that from 2006 through at least 2009, Director Bates consistently rated Officer Keetch's performance higher that Ms. Ovard's. (*See* Am. Compl. ¶ 37, Dkt. 32.) Ms. Ovard concedes that these claims are time-barred. In any event, a comparison between Ms. Ovard's and Officer Keetch's performance evaluations is difficult because Ms. Ovard is the Field Supervisor and has different responsibilities from an Officer. For these reasons, the court dismisses any claims based on the difference in raises or performance evaluations between Ms. Ovard and Officer Keetch.

15

B.    Prima Facie Case of Age Discrimination

To survive summary judgment on an age discrimination claim where there is no direct evidence of discrimination, a plaintiff must follow the traditional *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010) (holding that the *McDonnell Douglas* framework applies to claims brought under the ADEA). Using this approach, Ms. Ovard must first establish a prima facie case of discrimination. *Jones*, 617 F.3d at 1278-79. The burden then shifts to Summit County to articulate a legitimate, nondiscriminatory reason for its decision, whereupon the burden shifts back to Ms. Ovard to show that the stated reason is pretextual. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). To establish a prima facie case of discrimination, Ms. Ovard must demonstrate that: 1) she is a member of the class protected by the ADEA; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class. *See id.*

The court finds that Ms. Ovard fails to meet the second prong of her prima facie burden because none of the alleged discriminatory acts she describes rises to the level of an adverse employment action. An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (citation omitted). "[A] mere inconvenience or an alteration of job responsibilities" is insufficient to qualify as an adverse employment action. *Id.* (citation omitted).

Ms. Ovard argues that the transfer of her responsibilities to Officer Keetch, Summit County's decision to schedule Ms. Ovard for weekend and afternoon shifts, and the disciplinary meetings were significant changes in her employment status. As discussed above, the court finds that many of these claims are time-barred. But even if they were not, Tenth Circuit precedent does not support Ms. Ovard's argument that these actions were sufficiently adverse. In *Seely v. Runyon*, the Tenth Circuit affirmed a decision in which the Honorable David K. Winder held that the plaintiff had not suffered an adverse employment action even though she faced changes to the terms and conditions of her employment that were at least as substantial as those faced by Ms. Ovard. 966 F. Supp. 1060 (D. Utah 1997), *aff'd*, 166 F.3d 348 (10th Cir. 1998). The plaintiff in *Seely* was a post office employee who was allegedly subjected to "threats of removal, harassment, intimidation, interference with her management of the Magna Post Office, and ultimately reassignment from the Magna office for ninety days for training in other offices." *Id.* at 1064. Judge Winder held that these allegations did not rise to the level of an adverse employment action because none of the plaintiff's "compensation, terms, conditions, or privileges of employment" had been altered. *Id.* at 1064. Judge Winder cited with approval the case of *Flaherty v. Gas Research Institute*, in which the Seventh Circuit held that a semantic change in title and a "bruised ego" did not constitute an adverse employment action where the plaintiff's pay and benefits remained the same. *Id.* at 1064-65 (citing *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994)). Judge Winder also noted that the alleged threats of removal were not adverse employment actions "because of their lack of consequence." *Id.* at 1064.

Ms. Ovard's allegations of adverse employment actions do not satisfy the standard set out

in *Seely* or in other Tenth Circuit cases. Any shift of responsibilities to Officer Keetch did not change the essential conditions of Ms. Ovard's employment but instead involved a mere alteration of job responsibilities. And the disciplinary meeting on May 18, 2010, did not even rise to the level where threats were made that Ms. Ovard would be fired. At most, Ms. Ovard received a Letter of Counsel that would make it easier for the County to fire her at some point in the future. But because she was never terminated or demoted, this Letter of Counsel (which, in any event, was subsequently removed from Ms. Ovard's file) does not qualify as an adverse employment action.[7] As Judge Winder stated, "To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future." *Seely*, 966 F. Supp. at 1064 (citation omitted).

Finally, the Tenth Circuit is clear that the decision to reinstate Ms. Ovard on a schedule working weekends and late shifts is not an adverse employment action. In *Daniels v. United Parcel Service, Inc.*, the Tenth Circuit held that there was no adverse employment action in a Title VII and ADEA disparate treatment case where the employee was assigned to work the night shift: "We acknowledge that many employees would find working the day shift preferable to the night shift. But this does not establish an assignment to the night shift is sufficiently material to constitute a significant change in employment status or responsibilities." 701 F.3d 620, 635 (10th Cir. 2012). And in *McGowan v. City of Eufala*, the Tenth Circuit found that there was no

---

[7]For similar reasons, the court notes that Ms. Ovard's disciplinary meeting with Director Bates and Captain Booth on September 28, 2010, does not constitute an adverse employment action. But because this meeting occurred after Ms. Ovard filed her complaint with the EEOC and the UALD, the court finds that this meeting is better analyzed in its discussion of Ms. Ovard's claim for retaliation.

adverse employment action in a Title VII retaliation claim where an employee was denied her request to transfer to the day shift because the day and night shifts "offered no difference in pay and benefits" and the employee desired transfer "purely for personal reasons." 472 F.3d 736, 743 (10th Cir. 2006).

Like the plaintiffs in these Tenth Circuit cases, Ms. Ovard was frustrated by her assignment to an unfavorable schedule, but has not shown any material difference in pay or benefits from her preferred schedule. In fact, Ms. Ovard's counsel admitted during oral argument that there are no compensatory damages at issue in this lawsuit. At most, Ms. Ovard contends that she is unable to perform one of the essential elements of her job because there are no officers working for her to supervise on the weekends and after 5:00 p.m. But while Ms. Ovard's work may be less enjoyable when her officers are not present, the court finds that any change in her duties during the weekends or on late shifts is the type of "mere inconvenience or an alteration of job responsibilities" that is insufficient to qualify as an adverse employment action. *Piercy*, 480 F.3d at 1203.

Because Ms. Ovard has not demonstrated that any of the alleged instances of discrimination were adverse employment actions, she has failed to carry her burden to show a prima facie case of age discrimination. As a result, the court grants summary judgment to Summit County on Ms. Ovard's disparate treatment claim.

C.     Additional Considerations

Summit County argues that Ms. Ovard's disparate treatment claim fails for two additional reasons. First, even if Ms. Ovard had alleged an adverse employment action, she must still show that she was treated less favorably than others who were not in her protected class to establish a

prima facie case of discrimination. *Jones*, 617 F.3d at 1278-79. While Ms. Ovard asserts that no other supervisor employed by the Sheriff's Office was required to work every weekend throughout the year, it is also true that the other supervisors employed by the Sheriff's Office worked in departments besides the Animal Control Division. Ms. Ovard and Director Bates were the only supervisors in the Division, and the Sheriff's Office decided that it would be best to have a supervisor working in the Division at all times. Ms. Ovard has not shown that other divisions controlled by the Sheriff's Office faced similar constraints or that the supervisors in these divisions were allowed to rotate their schedules. As a result, Ms. Ovard could at best establish only a weak prima facie case of discrimination if she were able to show that she suffered an adverse employment action.

Second, a plaintiff who has demonstrated a prima facie case of discrimination still carries the burden to show that an employer's stated nondiscriminatory reason for the adverse employment action is pretextual. *See id.* at 1278. A plaintiff cannot show that an employer's stated reason is pretextual unless she can produce "evidence of such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

Here, Summit County has offered legitimate, nondiscriminatory reasons for the incidents that Ms. Ovard claims are examples of age discrimination. Summit County asserts that the disciplinary meeting on May 18, 2010, occurred because Ms. Ovard and Director Bates had a conflict about who should perform Officer Keetch's evaluation. While a reasonable jury might

favor Ms. Ovard's position in this misunderstanding, no reasonable jury could find on the record before the court that the stated reason for the meeting was pretextual.

As for Ms. Ovard's weekend schedule, Summit County maintains that Ms. Ovard was assigned this schedule in June 2010 as a result of Officer Steed's movements between the Sheriff's Office and the Animal Control Division. Taking the facts in the light most favorable to Ms. Ovard, the court agrees that Ms. Ovard's schedule change does not entirely correspond to whether Officer Steed was working in the Division. Although Ms. Ovard was put on the weekend schedule when Officer Steed returned to the Division on June 12, 2010, Ms. Ovard remained on the same schedule even after Officer Steed was transferred back to the Sheriff's Office on July 24, 2010. Ms. Ovard's schedule change appears to be more highly correlated with whether Captain Booth was managing the Division, since Ms. Ovard's switch back to the weekend shift occurred only a few months after Captain Booth returned to supervising the Division in April 2010. But the court need not decide whether this correlation provides sufficient evidence of pretext because it finds that Summit County's decision to assign Ms. Ovard to weekend and late shifts does not constitute an adverse employment action.

### III. Hostile Work Environment Claim

Summit County argues that Ms. Ovard has never adequately asserted a discrimination claim based on a hostile work environment. Ms. Ovard maintains that her factual allegations include a hostile work environment claim even if these exact terms are not found in her Complaint. Even so, Ms. Ovard has moved to amend her Complaint to add this claim definitively.

Assuming that Ms. Ovard has properly alleged a hostile work environment claim, the

court finds that her claim nevertheless fails. To survive summary judgment on an allegation of a hostile work environment, a plaintiff must show that a rational jury could find that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998). Courts look to the "totality of the circumstances" and "consider[] such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

Even taking the facts in the light most favorable to Ms. Ovard, the instances of discriminatory conduct that she alleges are too infrequent and too minor to create a hostile work environment. Ms. Ovard construes the changes to her work schedule and the assignment of certain responsibilities to Officer Keetch as a continuous action that occurred over many years. But these allegations are the result of discrete decisions made by Summit County. The only definitive documentation of Officer Keetch's new responsibilities occurred in April 2006. And Ms. Ovard's work schedule was only changed three times: in April 2006, she was placed on the rotation schedule; in March 2007, she was assigned a permanent weekend schedule; and in June 2010, she was reassigned the weekend schedule after having worked from Monday to Friday for a few months. While Ms. Ovard may have felt the effects of these decisions over a longer period of time, Summit County's scheduling and management choices are not the sort of pervasive conduct required to create a hostile work environment.

Besides Ms. Ovard's frustration with her work schedule and her feeling that her duties had been transferred to Officer Keetch, Ms. Ovard cites the comments made about her retirement as examples of a hostile work environment. But Ms. Ovard only cites a few comments that were made over a five-year period, and the majority of these comments relate only tangentially to her age by referring to the possibility of retirement. Several comments occurred in settings in which it would not be unusual for a supervisor to ask an employee about her plans to continue working. For instance, Captain Booth asked Ms. Ovard about her plans for retirement during a series of interviews in March 2007 in which he was getting to know the employees in the Animal Control Division, and Sheriff Edmunds asked Ms. Ovard about her plans for retirement during a series of meetings in May 2010 in which he asked all the employees in the Division a set of similar questions. The only truly severe comment that Ms. Ovard alleges is a question by Captain Booth in 2010: "I don't know how old you are but when are you going to retire?" The parties dispute whether Captain Booth actually asked this question. But even assuming that Ms. Ovard's recollection is correct, Captain Booth's isolated comment is the sort of offensive utterance that, standing alone, is insufficient to create a hostile work environment.

Considering the totality of the circumstances, Ms. Ovard has not shown that the workplace at the Animal Control Division was permeated with ridicule and insult. Because the court must therefore dismiss any properly alleged hostile work environment claim, it would be futile to allow Ms. Ovard to amend her Complaint or to interpret her Complaint as alleging such a claim.

## IV.    Retaliation Claim

Ms. Ovard alleges that Summit County retaliated against her for filing a complaint with

23

the EEOC and the UALD in which she alleged that she had been subjected to discrimination based on age. Ms. Ovard's retaliation claim is therefore limited to the events that occurred after she filed her first complaint with the EEOC and the UALD. The two incidents that Ms. Ovard cites are the meeting with Director Bates and Captain Booth on September 28, 2010, and her performance evaluation meeting with Director Bates on March 23, 2011.

The court again applies the *McDonnell Douglas* burden-shifting framework, in which the plaintiff must first establish a prima facie case of retaliation before the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision, and then back to the plaintiff to show that the stated reason is pretextual.

A.       Prima Facie Case of Retaliation

To meet her prima facie burden for retaliation, Ms. Ovard must show: 1) she was engaged in protected opposition to discrimination; 2) a reasonable employee would have found the challenged action materially adverse; and 3) a causal connection existed between the protected activity and the action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). The court finds that Ms. Ovard fails to meet the second and third prongs of this test.

To demonstrate that a challenged action is materially adverse, the injury must rise to a "level of seriousness" that would "dissuade a reasonable worker from filing or pursuing a discrimination claim." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). Even if the September 28, 2010, meeting resulted in a written reprimand, there is no allegation that the note was accompanied by any threats that Ms. Ovard would be fired. Ms. Ovard alleges that the meeting was conducted in a threatening undertone, that she was intimidated because the

meeting was held at the Sheriff's Office and not at the Animal Control Division, and that she felt

that her job was more in jeopardy than it had been before the meeting. But the court must

consider the circumstances from an objective standard. *See id.* Ms. Ovard has not cited any

authority from the Tenth Circuit holding that a similar post-complaint meeting qualifies as a

materially adverse action. Instead, several appellate courts have reached the opposite conclusion.

*See Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) (holding that allegedly

undeserved post-complaint reprimands unaccompanied by "tangible consequences" were not

materially adverse); *Cole v. Illinois*, 562 F.3d 812, 817 (7th Cir. 2009) (holding that a post-

complaint improvement plan indicating that the plaintiff should "become more aware of her

tone" was not retaliatory). Ms. Ovard may have felt that Captain Booth and Director Bates held

the meeting merely to discipline her. But given the facts here, and in the absence of any tangible

consequences, a disciplinary meeting alone does not rise to the level of a materially adverse

action.

While Ms. Ovard fails to show that the September 28, 2010, meeting was materially

adverse, her allegation that her lower performance score in March 2011 was retaliatory fails

because she has not demonstrated that it was a result of filing a discrimination charge. The

performance evaluation meeting occurred many months after Ms. Ovard filed her complaint.

Even if the court accepts Ms. Ovard's assertion that the performance evaluation was completed

on January 11, 2011, there were still over three months that elapsed between the filing of the

discrimination complaint and the evaluation. The Tenth Circuit has held that this length of time

is insufficient to establish causality without additional evidence. *See Hennagir v. Utah Dep't of

Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (holding that the plaintiff did not show a connection

between any protected activity and the alleged adverse actions—an alteration to her performance review and being blamed for a mistake made in the office—where the only evidence of retaliatory motive was that the actions occurred within several months after the plaintiff filed her discrimination complaint).

     B.    <u>Pretext</u>

While the court finds that Ms. Ovard has not made out a prima facie case, Ms. Ovard's retaliation claim fails for the additional reason that she has not carried her burden to show that Summit County's stated reasons for its actions were pretextual.

Summit County argues that the September 28, 2010, meeting was held because Ms. Ovard missed a training session. These facts are not in dispute, although Ms. Ovard argues that she did not have to attend the session because she was taking her husband to the doctor. While Ms. Ovard may have had a reasonable excuse for missing the training session, Director Bates and Captain Booth still had a valid, nondiscriminatory reason to meet with her. Moreover, Ms. Ovard was not the only employee who missed the training session, and part of the stated reason for the disciplinary meeting was to tell Ms. Ovard to remind her officers that they needed to attend mandatory training sessions. Finally, Captain Booth testified that another reason for the meeting was to discuss Ms. Ovard's evaluation of Officer Peterson and to explain to Ms. Ovard that the Sheriff's Office was concerned about overinflated performance scores. All of these stated reasons for meeting with Ms. Ovard are valid and nondiscriminatory and Ms. Ovard has not presented any specific evidence to show that any of these reasons were pretextual.

Similarly, Ms. Ovard has not rebutted Summit County's assertion that her lowered performance evaluation score in March 2011 was the result of a new Sheriff Office's directive

concerning overinflated scores.  In contrast, Summit County's stated reason for the lower score is supported by several pieces of evidence, including the transcript of the meeting on September 28, 2010.  During this meeting, Captain Booth explained the new system and told Ms. Ovard that any scores above a "3" were now required to be supported by written documentation.  This conversation concerned Officer Peterson's evaluation, and it therefore appears that Ms. Ovard was not the only employee to receive a lower performance score on her 2010 evaluation than on previous reports.

For these reasons, the court finds that Ms. Ovard has not presented any evidence that Summit County's stated reasons for either the disciplinary meeting or Ms. Ovard's lower performance evaluation score were pretextual.

## CONCLUSION

For the foregoing reasons, the court GRANTS Summit County's Motion for Summary Judgment.  (Dkt. 74.)  Ms. Ovard's Motion for Leave to Amend her Complaint (Dkt. 109) is DENIED.  Ms. Ovard's Motion to Correct her Response Memorandum (Dkt. 120) and Summit County's Motion to Strike this Motion (Dkt. 126) are DENIED AS MOOT.

DATED this 2nd day of December, 2013.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge